UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| BENJAMIN WEBBER, et al., | ) | |
| *on behalf of themselves and all* | ) | |
| *others similarly situated,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:24-cv-00401-JAW |
| | ) | |
| FINANCE AUTHORITY OF MAINE, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MOTIONS TO DISMISS**

Seeking class certification, a student loan borrower and his co-signers sue a state loan provider and its lawyers alleging their administration of a state loan program violates state and federal law, and a state court administrator alleging constitutional violations for denying access to public records. The state agency, its outside counsel, and the state court administrator each filed a motion to dismiss. The court grants the state agency's motion to dismiss for lack of subject matter jurisdiction, and the outside counsel's and the state court administrator's motions to dismiss for failure to state a plausible claim for relief.

## I.   BACKGROUND

### A.   Procedural History

Arising from a dispute over the Finance Authority of Maine's (FAME) conduct in administering and collecting payments on a student loan program, Plaintiffs Benjamin Webber, Elizabeth Brann, and William Brann (the Plaintiffs) filed this putative class action against FAME, its outside counsel, and a state court employee

for alleged violations of state law, federal law, and the United States Constitution. *Compl.* (ECF No. 1); *Am. Compl.* (ECF No. 3).  The Plaintiffs accuse FAME and its outside counsel of an illegal "scheme to collect zombie student loan debt" through "false, deceptive, and misleading representations about the character and amount of the student debt" and then allegedly using "unfair means to collect [the debt] in Maine courts." *Am. Compl.* at 1, ¶¶ 62-76.  The Plaintiffs also allege Maine court policy denies them access to records regarding collection actions brought by FAME against similarly situated student borrowers in state court, which they claim violates their right of public access under the First Amendment. *Id.* ¶¶ 59-61.  The Plaintiffs seek certification of their class action on behalf of all student borrowers sued by FAME on loans administered through the same student loan program. *Id.* ¶¶ 78-85.

The Plaintiffs' complaint raises four claims.  Pursuant to 42 U.S.C. § 1983, Count I alleges Amy Quinlan in her official capacity as Maine State Court Administrator violated the Plaintiffs' First Amendment rights by denying the Plaintiffs access to state court records. *Am. Compl.* ¶¶ 59-61.  Count II alleges FAME and its outside counsel, Attorney Edwin Daggett, Jr. and law firm of Daggett & Parker (the Attorney Defendants), violated federal and state fair debt collection laws, 15 U.S.C. § 1692 and 32 M.R.S. § 11001. *Id.* ¶¶ 62-65.  Count III alleges FAME and the Attorney Defendants violated Maine's Student Loan Bill of Rights and Maine's Unfair Trade Practices Act, 9-A M.R.S. § 14-103 and 5 M.R.S. § 205-A. *Id.* ¶¶ 66-73.  Finally, Count Four alleges breach of contract against FAME for violating the terms of its loan agreement with the Plaintiffs. *Id.* ¶¶ 74-76.

All three sets of defendants filed motions to dismiss the Plaintiffs' respective claims. On March 5, 2025, Ms. Quinlan filed a motion to dismiss for failure to state a claim. *Mot. to Dismiss of Def. Amy Quinlan* (ECF No. 5) (*Quinlan's Mot.*). On March 7, 2025, the Attorney Defendants filed a motion to dismiss for failure to state a claim. *Defs. Edwin R. Daggett, Jr., and Daggett & Parker's Mot. to Dismiss Pls.' Compl.* (ECF No. 8) (*Att'y Defs.' Mot.*). On March 10, 2025, FAME filed a motion to dismiss for lack of subject-matter jurisdiction and for failure to state a claim. *Def. Fin. Auth. of Maine's Mot. to Dismiss* (ECF No. 9) (*FAME's Mot.*).

On April 16, 2025, the Plaintiffs filed separate responses to FAME's and the Attorney Defendants' motions to dismiss. *Pls.' Resp. to Defs. Edwin Daggett, Jr., and Daggett & Parker's Mot. to Dismiss* (ECF No. 14) (*Pls.' Opp'n to Att'y Defs.' Mot.*); *Pls.' Resp. to Def. Fin. Auth. of Maine's Mot. to Dismiss* (ECF No. 15) (*Pls.' Opp'n to FAME's Mot.*). About a month later, on May 7, 2025, the Plaintiffs filed their response to Ms. Quinlan's motion to dismiss. *Pls.' Resp. to Def. Amy Quinlan's Mot. to Dismiss* (ECF No. 21) (*Pls.' Opp'n to Quinlan's Mot.*).

On April 30, 2025, FAME filed their reply. *Def. Fin. Auth. of Maine's Reply in Supp. of Mot. to Dismiss* (ECF No. 20) (*FAME's Reply*). On May 14, 2025, the Attorney Defendants filed their reply. *Defs. Edwin R. Daggett, Jr., and Daggett & Parker's Reply to Pls.' Opp'n to Mot. to Dismiss* (ECF No. 23) (*Att'y Defs.' Reply*). Finally, on May 19, 2025, Ms. Quinlan filed her reply. *Reply Mem. in Further Supp. of Mot. to Dismiss of Def. Amy Quinlan* (ECF No. 25) (*Quinlan's Reply*).

### B.    Factual Background

#### 1.    The Parties

The Plaintiffs, Benjamin Webber and his parents Elizabeth Brann and William Brann, are Maine residents who received two $10,000 student loans from the Maine Educational Loan Authority (MELA) in 2005 and 2006, respectively.  *Am. Compl.* ¶ 4, 24-25.

FAME is an instrumentality of the state of Maine, responsible for administering a variety of financial programs, including student loans for post-secondary education.  *Id.* ¶¶ 7, 9; 10 M.R.S. § 962; 20-A M.R.S. § 11412.  FAME is the statutory successor to MELA, the agency that awarded the Plaintiffs their two student loans in 2005 and 2006.  *Id.* ¶¶ 7, 12.  As MELA's statutory successor, FAME has inherited MELA's contracts, loans, assets, receivables, and obligations.  *See* 20-A M.R.S. § 11414.

The Attorney Defendants are Edwin R. Daggett, Jr., a private attorney in Maine, and his Maine-based law firm, Daggett & Parker.  The Attorney Defendants provide FAME outside counsel services and have represented FAME in a collection action against the Plaintiffs in state court for the outstanding balance of the Plaintiffs' 2006 student loan.  *Id.* ¶ 11, 25, 35-37, 43; *see id.*, Attach. 3, *State Ct. Compl.*  The Plaintiffs bring this action against the Attorney Defendants as agents of FAME and debt collectors as defined under state and federal law.  *Id.* ¶ 11 (citing in 15 U.S.C. § 1692a and 32 M.R.S. § 11002).

Amy Quinlan is the State Court Administrator for the state of Maine. *Id.* ¶ 10. The Plaintiffs sue Ms. Quinlan in her official capacity. *Id.*

### 2.    The Maine Loan Program and the Plaintiffs' Default

FAME's predecessor, MELA, administered the Maine Loan Program, which provided student loans to Maine students pursuing higher education. *Id.* ¶ 12-13. These student loans are funded in part by Student Loan Revenue Bonds issued by FAME (previously MELA), as well as non-lapsing revolving funds created by the legislature, such as The Blaine House Scholars Fund. *Id.* ¶ 16. MELA offered a variable interest rate and limits on collection costs and late fees, among other terms. *Id.* ¶ 12. Many of these student loans were assigned to a private administrator, Transworld Systems, Inc. (TSI), for debt servicing or for collection on defaulted student loans. *Id.* ¶ 14.

Benjamin Webber, who worked his way through school, received two student loans through the Maine Loan Program to help fund his education at the University of Southern Maine. *Id.* ¶ 23. In 2005, Benjamin Webber received his first $10,000 student loan through the Maine Loan Program, which he paid back in full. *Id.* ¶ 24. On September 2, 2006, Benjamin Webber, along with his parents as co-borrowers Elizabeth Brann and William Brann, received a second $10,000 student loan through the Maine Loan Program. *Id.* ¶¶ 4, 25.

Despite working full time, Benjamin Webber could not afford the monthly payment on his second student loan. *Id.* ¶ 26-27. He stopped his monthly payments after January 2012 and later defaulted on March 30, 2012. *Id.* ¶¶ 25-27, 35. On April

6, 2012, MELA assigned his student loan to TSI for collection, charging him approximately $3,215.49 in collection costs. *Id.* ¶¶ 14, 26. Mr. Webber states he attempted but ultimately was unable to negotiate a payment plan to repay his loan. *Id.* ¶ 27. For several years after, the Plaintiffs claim, "nothing was done to enforce the terms of the loan." *Id.* However, since 2015, FAME has offset the Plaintiffs' state income tax credits by approximately $6,000. *Id.* ¶ 31.

On December 7, 2022, the Attorney Defendants on behalf of FAME wrote to the Plaintiffs seeking to collect on the outstanding balance.[1] *Id.* ¶ 29. On December 19, 2022, Benjamin Webber responded to the collection letter, disputing that he owed the debt and requesting verification of the loan's balance. *Id.* ¶ 29; *id.*, Attach. 2, *Webber Letter*. According to the Plaintiffs, the Attorney Defendants "did not verify the debt," and instead referred them to the same disputed "'complete loan advance and payment history' that [Benjamin] Webber questioned in the first place." *Id.* ¶ 30.

### 3.    State Court Debt Collection Action

On July 6, 2023, FAME, represented by the Attorney Defendants, filed a complaint against the Plaintiffs in Maine state court seeking judgment in the amount of $21,228.19 for the outstanding loan balance, including interest, costs, and fees. *Id.* ¶¶ 35, 39; *State Ct. Compl.*; *Fin. Auth. of Me. v. Webber*, No. LEWDC-CV-2023-289. On May 2, 2025, the Superior Court issued judgment in FAME's favor and against

---

[1]    Although the complaint refers to a December 7, 2022 collection letter addressed to Benjamin Webber from the Attorney Defendants on behalf of FAME, the letter is not provided as an attachment to the complaint. However, the complaint does attach Benjamin's Webber's December 19, 2022 letter responding to FAME's December collection letter, which states that it is a "response" to FAME's "letter dated 12/7/22." *See Webber Letter*. Although the Attorney Defendants contest the contents of the collection letter, they do not dispute its existence or author. *See Att'y Defs.' Mot.* at 2.

the Plaintiffs.[2] *See Att'y Defs.' Reply*, Attach. 1, *Decision and J.* On January 29, 2026, the Maine Supreme Judicial Court affirmed the trial court's judgment. *See Fin. Auth. of Me. v. Webber*, Mem. 26-32, 2026 Me. Unpub. LEXIS 35 (Jan. 29, 2026).[3]

### 4.    The Plaintiffs' Rule 80C Appeal in State Court

In July 2024, prior to filing this federal action, Benjamin Webber filed a Maine Rule 80C appeal in Kennebec County Superior Court, challenging FAME's administrative decision denying Benjamin Webber's challenge to FAME's offset on his 2023 tax refund against the outstanding loan. *Webber v. Finance Authority of Maine*, Docket No. AP-24-32; *FAME's Mot.*, Attach. 7, *R. 80C Pet. of Final Agency Action*; *Att'y Defs.' Mot.*, Attach. 2, *2023 Tax Offset-Benjamin Webber (Finance Authority of Maine)—Hearing Decision*.[4]

### 5.    The Plaintiffs' Federal Action

On November 25, 2024, while the state proceedings were pending, the Plaintiffs initiated this federal action, accusing FAME and the Attorney Defendants

---

[2]     The Court takes judicial notice of the Superior Court's judgment because it is a public record susceptible to judicial notice, the Plaintiffs sufficiently refer to the state court proceeding in their complaint, and the parties do not dispute its authenticity. *See Watterson v. Page*, 987 F.2d 1, 3-3 (1st Cir. 1993) (citing caselaw); *see also Rodi v. S. New Eng. Sch. of Law*, 389 F.3d 5, 12 (1st Cir. 2004) ("[T]he jurisprudence of Rule 12(b)(6) permits courts to consider matters that are susceptible to judicial notice"); *Boateng v. InterAmerican Univ.*, 210 F.3d 56, 60 (1st Cir. 2000) (a court "may look to matters of public record in deciding a Rule 12(b)(6) motion").

[3]     For the same reason, *see supra* n.2, the Court takes judicial notice of the Maine Supreme Judicial Court's memorandum of decision affirming the trial court's judgment. *See Boateng*, 210 F.3d at 60 (a court "may look to matters of public record in deciding a Rule 12(b)(6) motion").

[4]     As explained, *see supra* n.2, the Court takes judicial notice of relevant state court proceedings. *See Wiener v. MIB Group, Inc.*, 86 F.4th 76, 81 n.3 (1st Cir. 2023) (taking judicial notice of public filings in state court proceeding in reviewing a complaint under Rule 12(b)(1)); *see also Kowalski v. Gagne*, 914 F.2d 299, 305 (1st Cir. 1990) ("It is well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand").

of several violations of state and federal law, namely for making false representations in state court debt collection actions and state administrative proceedings against student borrowers regarding the terms of their student loan agreements and the amount owed. *Am. Compl.* at 1-2, ¶¶ 62-76. The Plaintiffs also claim that state court policy denies them access to information related to other FAME debt collection actions in state court, which violates their right of public access to court records under the First Amendment. *Id.* ¶¶ 59-61. The Plaintiffs also seek class action certification on behalf of all student borrowers sued by FAME on loans administered through the Maine Loan Program. *Id.* ¶¶ 78-85.

### a.    The Alleged Scheme

According to the Plaintiffs, FAME and the Attorney Defendants "mak[e] false, deceptive, and misleading representations in administrative proceedings and court documents to unfairly pressure student borrowers to consent to judgement on" student loans administered by FAME. *Id.* at 2. The Plaintiffs allege FAME's state court collection actions against student borrowers falsely assert that (1) the agency maintains contemporaneous accurate business records, (2) that the loan agreement's interest rate becomes fixed after default and (2) the agency's "collection and late fees are relatively low, when in fact they are excessively high and in blatant violation of the terms of the contract." *Id.* Furthermore, the Plaintiffs allege FAME and the Attorney Defendants illegally take the "tax refunds of student borrowers on debts that are not liquidated" and make false representations in state administrative proceedings "about program policies related to interest rates that do not exist." *Id.*

The Plaintiffs allege several violations of state and federal law against FAME's administration and collection practices. First, they claim that FAME does not apply the correct interest rate upon default. *Id.* ¶¶ 20, 36. According to the Plaintiffs, their student loan agreement provides for a variable interest rate and not the fixed interest rate FAME applied after they defaulted. *Id.* ¶¶ 20-22, 36. The Plaintiffs argue that FAME arbitrarily applied a fixed interest rate of 8.45%, instead of tying the variable interest rate to the bond that funded the loan, the one-year Treasury rate, or the rate of the Blaine House Scholars non-lapsing loan fund, which they insist their loan agreement requires. *Id.* ¶ 21.

Second, the Plaintiffs claim FAME charged unreasonable collection costs and late fees. The Plaintiffs report being charged $2,836 in late fees which they argue is unreasonable and in excess of the maximum permitted under the terms of their loan agreement. *Id.* ¶ 36. The Plaintiffs also decry a $3,215 collection fee FAME charged less than ten days after the Plaintiffs' default, "despite no steps taken by TSI to enforce the terms of the note." *Id.* at 2.

Third, the Plaintiffs allege FAME improperly took their tax refunds based on false representations to the Maine Revenue Service that the defaulted loan was "liquidated." *Id.* ¶¶ 28, 33. Between 2015 and the present, FAME has offset the Plaintiffs' state income tax credits by approximately $6,000, including an offset of $287 on April 10, 2024. *Id.* ¶ 31. The Plaintiffs also allege that these amounts were not properly allocated to the principal and interest in violation of the loan agreement and Maine's Student Bill of Rights. *Id.* ¶¶ 31, 71.

Finally, pointing to a 2017 Consumer Financial Protection Bureau consent order against TSI for various violations of the Consumer Financial Protection Act, including deceptive practices in debt collection lawsuits, *id.* at 1 (citing *Transworld Sys., Inc.*, CFPB No. 2017-CFPB-0018 (Sep. 18, 2017)), the Plaintiffs claim that TSI "did not keep accurate records[ ] and otherwise engaged in unfair and unlawful debt collection practices." *Id.* ¶ 15.

Building on these claims, the Plaintiffs contend that FAME's state court action against them is "false, misleading, and unfair." *Id.* at 1-2, ¶¶ 36, 38-39, 62-73. As the Plaintiffs see it, FAME "did not adequately integrate records related to The Maine Loan program into its own records, did not review, verify, or establish the accuracy of the contents of the records before it sued plaintiffs, and unreasonably relied on untrustworthy information in the servicing and collecting of debts after the merger." *Id.* ¶ 18. Specifically, the Plaintiffs insist that FAME and the Attorney Defendants filed a "false, misleading, and unfair" affidavit in state court because, among other misrepresentations about the amount and character of the debt, it does not include all payments received and the correct interest rate. *Id.* ¶¶ 20-22, 37-39. The Plaintiffs also argue that FAME's witness does not have personal knowledge of the Plaintiffs' account, and that the records attached to FAME's state court complaint are not kept in the regular course of FAME's business. *Id.* ¶ 38.

Similarly, the Plaintiffs allege FAME made false representations during the Plaintiffs' state administrative challenge to tax setoffs against their loan. As explained, the Plaintiffs allege that FAME improperly took their tax refunds based

10

on false representations to the Maine Revenue Service that their debt was "liquidated." *Id.* ¶¶ 28, 33. The Plaintiffs also allege that these amounts were not properly allocated to the principal and interest. *Id.* ¶¶ 31, 71. Finally, the Plaintiffs allege that in an agency decision justifying its tax credit setoffs against the Plaintiffs' debt, FAME misrepresented that that its policy allows it to charge a fixed interest rate after default. *Id.* ¶¶ 22, 40. Yet at the December 9, 2024 bench trial in state court, the Plaintiffs claim that FAME testified there was no such policy. *Id.* ¶ 41.

In summary, the Plaintiffs allege that FAME and the Attorney Defendants are attempting "to collect stale" student loan debt "based on shoddy evidence it knows is not reliable." *Id.* ¶ 52. In doing so, the Plaintiffs allege, FAME and the Attorney Defendants have violated various state and federal laws.

### b.     Access to State Court Records

In preparing to file this putative class action, the Plaintiffs report that they encountered challenges gathering information on FAME's collection actions against similarly situated student borrowers in state court, either because the electronic records for those actions are "confidential" and therefore only available to the parties and attorneys of record, or because accessing those records requires a burdensome fee that serves no legitimate purpose. *Id.* ¶¶ 46-47, 52-54.

The Androscoggin County Superior Court is a Maine eCourt, an electronic case filing system providing the public online access to Maine court records. *Id.* ¶¶ 43-44. The Plaintiffs claim that Maine court policy requires "designat[ing] ordinary civil collection lawsuits brought by FAME against student borrowers as 'confidential' and

11

therefore inaccessible to nonparties unless" the non-party completes a form and pays a fee. *Id.* ¶ 45. The Plaintiffs claim this "[b]urdensome and intrusive paperwork and fees . . . to simply look at electronically filed public records . . . serves no legitimate state interest." *Id.* ¶ 46.

The Plaintiffs cite two FAME state collection actions against student borrowers in Androscoggin County Superior Court, a Maine eCourt, that they claim are marked "confidential" and thus "inaccessible to anyone on the eCourt filing system except the parties and attorneys of record": LEWDC-CV-00436 and LEWDC-CV-2003-00283. *Id.* ¶¶ 47-49. The Plaintiffs report that Tyler Technologies, the private company that manages the eCourt software, marked these cases confidential "because of a policy of the State Court Administrator granting access to only parties or attorneys of record" and that if the State Court Administrator "mark[s] the documents as non-confidential . . . the documents would be publicly available" online. *Id.* ¶¶ 48-50.

According to the Plaintiffs, because "Maine eCourts do not maintain paper case files of these civil proceedings that one can view at the courthouse," the Maine court policy "charging fees and requiring forms to access public records . . . is unreasonable" and violates "[t]he right of access to judicial records" under the First Amendment. *Id.* ¶¶ 51, 54, 58. The Plaintiffs argue "[t]here is no compelling state interest in keeping records and proceedings related to lawsuits brought by FAME and the [Attorney Defendants] against Maine student borrowers confidential" and that "[t]here is no rational basis for" charging a fee and requiring the nonparty to complete probing

paperwork "inquiring about the purpose or identity of the persons" seeking access. *Id.* ¶¶ 55-56. Given that "no reasonable alternatives exist to adequately protect" their right to public access combined with the claim that "[i]t is not overly burdensome for the State Court Administrator to make public records 'non-confidential' in the eCourt system," the Plaintiffs insist the Maine court policy denying access to the FAME collection action records violated their First Amendment rights. *Id.* ¶¶ 57-58.[5] The Plaintiffs argue that Ms. Quinlan's enforcement of this alleged policy violated their First Amendment rights. *Id.* ¶ 60. They seek declaratory and injunctive relief against Ms. Quinlan. *Id.* ¶ 61.

## II.    THE PARTIES' POSITIONS

### A.    The Plaintiffs' Complaint

#### 1.    Count I – Violation of the Right of Public Access

Count I alleges Amy Quinlan, in her official capacity as State Court Administrator, "implemented a policy of the State of Maine Judicial Branch that unconstitutionally denies access to electronically filed civil court complaints, records and proceedings," specifically e-filed records in civil actions brought by FAME, in violation of the Plaintiffs' First Amendment rights. *Id.* ¶¶ 6, 54, 59-60.

---

[5]    Specifically, the Plaintiffs decry a policy of denying public access to electronic state court filings by "designating civil complaints brought by FAME as 'confidential'" and charging "[b]urdensome and intrusive paperwork and fees" that "serves no legitimate state interest," and "causes irreparable harm" to the Plaintiffs and their class members. *Id.* ¶¶ 46, 51-55. The Plaintiffs submit that Maine has no "overriding interest" to supersede the public right of access to these judicial records. *Id.* ¶ 58.

**2. Count II – Violations of State and Federal Fair Debt Collection Practices Acts**

Count II alleges FAME and the Attorney Defendants violated the Plaintiffs' rights under state and federal fair debt collection practices law, 15 U.S.C. § 1692 and 32 M.R.S. § 11001, for (1) false, misleading, and deceptive representations of the character, amount, or legal status of the Plaintiffs' student loan; (2) charging and collecting costs, fees, and interest not expressly contemplated in their loan agreement; (3) failing to credit payments or offsetting tax credits; (4) using false or misleading documentation in lawsuits and agency administrative decisions; and (5) continuing to offset tax credits and unfairly collecting debt after the Plaintiffs disputed the amount and requested verification. *Id.* ¶¶ 62-65.

**3. Count III – Violations of Maine Student Loan Bill of Rights and Maine Unfair Trade Practices Act**

Count III alleges FAME and the Attorney Defendants violated the Plaintiffs' rights under Maine's Student Loan Bill of Rights and Maine's Unfair Trade Practices Act, 9-A M.R.S. §§ 14-103, 14-107, 14-108 and 5 M.R.S. §§ 205-A and 213, by (1) directly or indirectly employing a scheme to defraud or mislead student loan borrowers; (2) filing misleading, unreliable, and erroneous information in state court litigation; and (3) failing to properly credit tax credit offsets and payments to the loan principal as required by Maine law. *Id.* ¶¶ 66-73.

**4. Count IV – Breach of Contract**

Count IV alleges FAME breached their loan agreement with the Plaintiffs by (1) charging an 8.45% fixed interest rate contrary to the terms of the agreement; (2)

14

failing to properly credit payments or offset tax refunds; (3) charging excessive fees; (4) and using false and deceptive documents in state court proceedings. *Id.* ¶¶ 74-76.

### B.     The Finance Authority of Maine's Motion to Dismiss

In it motion to dismiss, FAME raises several arguments.  First, FAME argues it is immune from the federal suit under the Eleventh Amendment as an arm of the state of Maine and therefore the Court lacks subject matter jurisdiction over the Plaintiffs' claims against it.  *FAME's Mot.* at 5-8.  Alternatively, FAME argues the complaint fails to state a plausible claim for relief, warranting dismissal of each count against FAME.  *Id.* at 8-15.  As for Count II, FAME argues the complaint fails to state a plausible claim for relief because neither federal nor Maine fair debt collection practice law applies to state agencies or state instrumentalities.  *Id.* at 8-10.  As for Count III, FAME maintains that Maine's Unfair Trade Practices Act and Student Loan Bill of Rights do not apply to FAME.  *Id.* at 10-11.  Finally, as for Count IV, FAME argues that the Plaintiffs' breach of contract claim is barred by sovereign immunity under Maine law—independent of FAME's asserted Eleventh Amendment immunity.  *Id.* at 11-12.  Furthermore, FAME maintains that Count IV fails to state a plausible claim for breach of contract.  *Id.* at 12-14.

#### 1.     The Plaintiffs' Opposition

In opposition to FAME's motion to dismiss, the Plaintiffs insist that their claims are not barred by the Eleventh Amendment for several reasons.  First, they argue that MELA, as the issuer of the Plaintiffs' student loans, is the proper entity for the purposes of the Court's Eleventh Amendment analysis, not FAME.  *Pls.' Opp'n*

*to FAME's Mot.* at 3. According to the Plaintiffs', MELA was neither a state agency nor a state instrumentality and therefore the Eleventh Amendment does not bar their claims. *Id.* at 3-8. Alternatively, should the Court conclude FAME is the proper entity, the Plaintiffs argue that (1) FAME's sovereign immunity has been waived by the various state and federal statutes provided in Counts II-IV and (2) *ex parte Young's* exception to the Eleventh Amendment empowers the Court to issue prospective relief and exercise its supplemental jurisdiction over their claims against FAME. *Id.* at 8-14.

### 2.    The Finance Authority of Maine's Reply

In reply, FAME argues its immunity "must be assessed on its own terms," insisting that whether MELA enjoyed sovereign immunity during its existence is irrelevant to assessing FAME's immunity under the Eleventh Amendment. *FAME Reply* at 1-2. FAME also reiterates that it is immune under the Eleventh Amendment and that the Plaintiffs have failed to state a plausible claim on each count. *Id.* at 1-4. Furthermore, FAME argues that the *Ex parte Young* exception is inapplicable to the claims against it and that the Plaintiffs have failed to point to any provision of state or federal law that waives their Eleventh Amendment immunity. *Id.* at 4-7.

### C.    The Attorney Defendants' Motion to Dismiss

The Attorney Defendants move to dismiss Counts II and III for failure to state a claim under Rule 12(b)(1) and 12(b)(6). As for Count II, the Attorney Defendants argue that the bulk of the Plaintiffs' claims is barred by the applicable statute of limitations. *Att'y Defs.' Mot.* at 4-5. On the surviving claims, the Attorney

16

Defendants submit a bevy of alternative grounds for dismissal, including (1) failure to state a plausible claim for relief; (2) res judicata; (3) lack of standing; (4) litigation privilege and absolute witness immunity; and (5) the *Rooker-Feldman* doctrine. *Id.* at 5-17. As for Count III, the Attorney Defendants argue the Plaintiffs have failed to state a plausible claim for relief under either Maine's Unfair Trade Practices Act or Student Loan Bill of Rights. *Id.* at 18-20.

### 1.    The Plaintiffs' Opposition

In their opposition, the Plaintiffs agree that their claims under Count II are controlled by a one-year statute of limitations, under both federal and state law. *Pls.' Opp'n to Att'y Defs.' Mot.* at 1. However, the Plaintiffs point to several allegations in their complaint that are within the statute of limitations, and they raise additional alleged violations of state and federal debt collection practice law not mentioned in the complaint. *Id.* at 2-6. The Plaintiffs argue that their complaint plausibly pleads a claim for relief under state and federal fair debt collection practice law, contesting the Attorney Defendants' arguments regarding res judicata, standing, the litigation privilege and witness immunity, and the *Rooker-Feldman* doctrine. *Id.* at 6-12. The Plaintiffs also insist that they have plausibly alleged a claim for relief against the Attorney Defendants under Maine's Student Loan Bill of Rights but do not address their claim under the Maine Unfair Trade Practices Act. *Id.* at 2-14

### 2.    The Attorney Defendants' Reply

In reply, the Attorney Defendants point to the state court judgment in FAME's collection action against the Plaintiffs, reiterating their argument that res judicata bars Count II. *Att'y Defs' Reply.* at 1-2. Alternatively, they reiterate that Count II

17

fails to state a claim for relief for the reasons set forth in their motion to dismiss. *Id.* at 2-6. Finally, the Attorney Defendants restate their argument that Count III fails to state a plausible claim for relief. *Id.* at 6-7.

### D.   Amy Quinlan's Motion to Dismiss

Ms. Quinlan argues the Plaintiffs' complaint fails to allege a violation of their First Amendment right of public access to judicial records on two grounds. First, Ms. Quinlan argues that the Plaintiffs fail to provide sufficient facts to support their conclusory allegations of First Amendment injury. *Quinlan's Mot.* at 8-9. Ms. Quinlan points out that the Plaintiffs' complaint does not identify any Maine court policy that renders FAME cases confidential or what that specific policy entails, including the form and fee the Plaintiffs allege they are required to submit, what information that form requires, as well as the fee's amount. *Id.* at 8-9.

Second, Ms. Quinlan argues Count I fails as a matter of law. *Id.* at 9-11. Citing the applicable Maine Judicial Branch rules and administrative orders, Ms. Quinlan explains that the Plaintiffs do have access to court records in FAME cases filed in eCourts, including for the cases cited in the Plaintiffs' complaint. *Id.* Further, Ms. Quinlan maintains that "neither of the two FAME cases the Plaintiffs cite, nor the records in those cases, are marked as confidential." *Id.* at 10. Although the document may be marked "hidden" online, she explains, these documents are available at a courthouse "for *free* and without the need to complete any form." *Id.* at 10-11 (emphasis in original). Ms. Quinlan therefore asks this Court to dismiss Count I with prejudice. *Id.* at 11.

18

### 1.    The Plaintiffs' Opposition

In opposition, the Plaintiffs concede that they now have access to the FAME collection actions at issue in their complaint but maintain Maine court policy violated their First Amendment rights. *Pls.' Opp'n to Quinlan's Mot.* at 1-2. The Plaintiffs supply additional information not included in their complaint, detailing their efforts to obtain the court records, including "two trips to Lewiston, several hours on the eCourt system with Tyler Technologies, a Freedom of Access Request, [and] a Freedom of Access Complaint." *Id.* 2-3. The Plaintiffs posit that the court records became available only after they filed this federal action against Ms. Quinlan. *Id.* at 1-3. As the Plaintiffs see it, the sum total of their efforts "finally brought relief and vindicated [their] First Amendment rights." *Id.* at 2-3. The Plaintiffs therefore conclude they are "'prevailing parties'" and request the Court award them attorney's fees pursuant to 42 U.S.C. § 1988. *Id.*

### 2.    Amy Quinlan's Reply

In her reply, Ms. Quinlan argues the Plaintiffs' nonresponsive opposition to her motion to dismiss waived any argument against dismissing Count I. *Ms. Quinlan Reply* at 2. The Plaintiffs' response, Ms. Quinlan points out, does not argue against dismissal, nor does it identify any Maine court policy or order supporting its claim of First Amendment injury. *Id.* Notwithstanding the Plaintiffs' waiver, Ms. Quinlan maintains Count I as pleaded in the complaint warrants dismissal under Rule 12(b)(6). Additionally, Ms. Quinlan asks the Court not to credit the Plaintiffs' new allegations in its opposition and further argues that the Plaintiffs' claim for attorney's

19

fees is improper.  *Id.* at 2-5.  Ms.  Quinlan affirms her request that the Court dismiss Count I with prejudice.  *Id.* at 5.

## III.    LEGAL STANDARDS

### A.    Motion to Dismiss for Lack of Subject Matter – Federal Rule of Civil Procedure 12(b)(1)

In evaluating a motion to dismiss under Rule 12(b)(1), the Court must determine whether the facts as alleged in the complaint, "taken at face value," support the existence of subject matter jurisdiction.  *Gordo-González v. United States*, 873 F.3d 32, 35 (1st Cir. 2017) (citing *Muniz-Rivera v. United States*, 326 F.3d 8, 11 (1st Cir. 2003)).  The Court must "accept the factual averments of the complaint as true" and "construe those facts in the light most congenial to the [plaintiff's] cause." *Royal v. Leading Edge Prods., Inc.*, 833 F.2d 1, 1 (1st Cir. 1987) (first citing *Guessefeldt v. McGrath*, 342 U.S. 308, 310 (1952); and then citing *Chongris v. Bd. of Appeals*, 811 F.2d 36, 37 (1st Cir. 1987)); *see also Menge v. N. Am. Specialty Ins. Co.*, 905 F. Supp. 2d 414, 416 (D.R.I. 2012) (The Court "appl[ies] a standard of review 'similar to that accorded a dismissal for failure to state a claim' under subsection 12(b)(6)") (quoting *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995)). "Dismissal can be justified only if it clearly appears that no colorable hook exists upon which subject matter jurisdiction can be hung."  *Royal v. Leading Edge Prods.*, 833 F.2d 1, 1 (1st Cir. 1987).  "At the same time," however, "when a defendant challenges subject matter jurisdiction, the plaintiff bears the burden of proving jurisdiction." *Lantigua-Núñez v. United States Coast Guard*, No. 24-2067, 2026 U.S. App. LEXIS 12687, at *5 (1st Cir. May 1, 2026).

> **B.**    **Motion to Dismiss for Failure to State a Claim – Federal Rule of Civil Procedure 12(b)(6)**

For a complaint to survive a motion to dismiss under Rule 12(b)(6), it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  Plausible means "something more than merely possible" or "merely consistent with a defendant's liability." *Germanowski v. Harris*, 854 F.3d 68, 71-72 (1st Cir. 2017) (quotation marks and citations omitted) (first quoting *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012), and then quoting *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 11 (1st Cir. 2011)).  Although this does not require "detailed factual allegations," the facts pleaded must at least "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Thus, a facially plausible complaint "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  In other words, dismissal is appropriate if a complaint's well-pleaded facts do not "possess enough heft to 'sho[w] that [the plaintiff] is entitled to relief." *Clark v. Boscher*, 514 F.3d 107, 112 (1st Cir. 2008) (first alteration in original) (quoting *Twombly*, 550 U.S. at 557).

Assessing a complaint's plausibility is a context-specific task that requires "the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  In the First Circuit, district courts apply a "two-step analysis." *Cardigan Mountain Sch. v. N.H. Ins. Co.*, 787 F.3d 82, 84 (1st Cir. 2015).  "First, the court must distinguish 'the [counterclaim's] factual allegations (which must be accepted as true)

from its conclusory legal allegations (which need not be credited).'" *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (quoting *Morales-Cruz v. Univ. of P. R.*, 676 F.3d 220, 224 (1st Cir. 2012)); *see also Schatz*, 669 F.3d at 55 (stating that a court may "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements").

"Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'" *García-Catalán*, 734 F.3d at 103 (quoting *Haley v. City of Bos.*, 657 F.3d 39, 46 (1st Cir. 2011)). "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." *S.E.C. v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (*en banc*) (citing *Twombly*, 550 U.S. at 555).

## IV.   DISCUSSION

First, addressing FAME's motion to dismiss, the Court concludes that the Eleventh Amendment bars the Plaintiffs' claims and therefore grants FAME's motion to dismiss for lack of subject matter jurisdiction. Second, the Court concludes the Plaintiffs have not pleaded a plausible claim for relief against the Attorney Defendants and therefore grants their motion to dismiss. Finally, the Court concludes the Plaintiffs have not plausibly alleged a First Amendment injury and therefore grants Ms. Quinlan's motion to dismiss.

### A.     The Finance Authority of Maine

The Eleventh Amendment deprives the federal courts of subject matter jurisdiction over suits by any citizen against any state. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996). This immunity extends to agencies under state control. *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993); *see also Poirier v. Mass. Dep't of Correction*, 558 F.3d 92, 97 (1st Cir. 2009) ("States and their agencies are entitled to sovereign immunity 'regardless of the relief sought'" (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985))); *Abdisamad v. City of Lewiston*, No. 2:19-cv-00175-LEW, 2019 U.S. Dist. LEXIS 103130, at *3 (D. Me. June 20, 2019) ("Sovereign immunity is an expansive principle that covers not only the state, but also agencies of the state and other entities that are an 'arm of the state'") (citations omitted).

"[W]hen a defendant challenges subject matter jurisdiction, the plaintiff bears the burden of proving jurisdiction." *Lantigua-Núñez*, No. 24-2067, 2026 U.S. App. LEXIS 12687 at *5 (1st Cir. May 1, 2026). Here, the Plaintiffs maintain that their claims against FAME are not barred by the Eleventh Amendment because MELA, FAME's statutory predecessor and the original issuer of the Plaintiffs' student loans, is the proper entity for the purposes of the Court's Eleventh Amendment analysis. The Plaintiffs maintain that MELA was not an arm of the state entitled to sovereign immunity. *Pls.' Opp'n to FAME's Mot.* at 3-8.

The Plaintiffs are mistaken that MELA, rather than FAME, is the proper entity for the Court's Eleventh Amendment analysis. First, the Plaintiffs' complaint

23

names FAME as a defendant, not MELA. *See Am. Compl.* ¶¶ 62-76. Second, MELA no longer exists. Maine merged MELA with FAME in 2015. *See* Act effective October 15, 2015, ch. 170, 2015 Me. Laws 173, 173-80; 20-A M.R.S. § 11414. Third, even assuming MELA was not protected by the Eleventh Amendment, MELA's status would not resolve the question of FAME's immunity. Thus, the relevant question here is simply whether FAME is entitled to Maine's Eleventh Amendment immunity from private suit in federal court.[6]

The Plaintiffs do not dispute FAME's contention that it enjoys Eleventh Amendment immunity an arm of the state Maine. *See Am. Compl.* ¶ 7 (stating that FAME "is an instrumentality of the State of Maine"); *see also Waterville Indus., Inc. v. Fin. Auth. of Me.*, 984 F.2d 549, 550-54 (1st Cir. 1993) (holding that FAME, as "an instrumentality of the state of Maine" is exempt from a federal environmental statute's contribution provision); *Waterville Indus., Inc. v. Fin. Auth. of Me.*, 2000 Me 138, ¶ 19 n.9, 758 A.2d 986 (explaining that the Eleventh Amendment bars federal court jurisdiction over a state law breach of contract claim against FAME, absent the State's consent). Instead, they argue that FAME's immunity is waived and that the *Ex parte Young* exception to sovereign immunity applies to their claims against FAME. *See Pls.' Opp'n to FAME's Mot.* at 3-14. Because the Plaintiffs "bear[ ] the burden of proving jurisdiction," the Court accepts their concession that FAME is

---

[6]     To the extent FAME's assumption of MELA's obligations upon merger is relevant to the Court's Eleventh Amendment analysis, as the Plaintiffs insist, in addition to demonstrating that MELA was not entitled to sovereign immunity, the Plaintiffs would then have to show that Maine intended to preserve any such lack of immunity on MELA's obligations upon its merger with FAME. The Plaintiffs, however, did not make this argument. *Lantigua-Núñez*, 2026 U.S. App. LEXIS 12687 at *5.

24

entitled to Eleventh Amendment immunity as an arm of the state of Maine and thus addresses the arguments they present on waiver and *Ex parte Young*. *Lantigua-Núñez*, 2026 U.S. App. LEXIS 12687 at \*5.

### 1.    Waiver

Eleventh Amendment immunity may be abrogated by Congress or waived by a state in narrow circumstances.  Congress may abrogate Eleventh Amendment immunity only by "an unequivocal expression of [its] intent to 'overturn the constitutionally guaranteed immunity of the several States.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984) (quoting *Quern v. Jordan*, 440 U.S. 332, 342 (1979)).  A state may waive its Eleventh Amendment immunity "in three ways: (1) by a clear declaration that it intends to submit itself to the jurisdiction of a federal court or administrative proceeding; (2) by consent to or participation in a federal program for which waiver of immunity is an express condition; or (3) by affirmative conduct in litigation." *New Hampshire v. Ramsey*, 366 F.3d 1, 15 (1st Cir. 2004) (internal citations omitted).[7]

The Plaintiffs have not met their burden to demonstrate that the Fair Debt Collections Practices Act (FDCPA) abrogates Maine's Eleventh Amendment immunity.  They do not identify any "unequivocal" statement in the statute

---

[7]    Only the first means of waiver is at issue here; the Plaintiffs do not argue FAME's Eleventh Amendment immunity is waived by consent or participation in a federal program or by affirmative litigation conduct.  The Court therefore does not address these means of waiver. *See Ramos-Pinero v. Puerto Rico*, 453 F.3d 48, 52 (1st Cir. 2006) (concluding that "[f]iling a motion to dismiss that specifically asserts Eleventh Amendment immunity" can hardly be viewed as an act that "evince[s] a clear choice to submit [the state's] rights for adjudication by the federal courts") (citation and quotation marks omitted)).

abrogating state sovereign immunity. *Pennhurst*, 465 U.S. at 99. Furthermore, the FDCPA expressly excludes state agencies from the definition of "debt collector." *See* 15 U.S.C. § 1692a(6)(C) (excluding from "[t]he term 'debt collector' . . . any officer or employee of . . . any State to the extent that collecting or attempting to collect any debt is in the performance of his official duties"); *id.,* § 1692a(8) ("The term 'State' means any State . . . or any political subdivision [thereof]"); *see also Banks v. ACS Educ.*, 638 Fed. Appx. 587, 589 (9th Cir. 2016) ("Congress has not abrogated state immunity under . . . the FDCPA); *Hart v. Shmayenik*, No. 23-cv-4779 (LTS), 2023 U.S. Dist. LEXIS 194630, at *5-6 (S.D.N.Y. Oct. 30, 2023) (dismissing FDCPA claim against state agency and state official in part because they are excluded from the statute's definition of "debt collector"); *Hansen v. Westly*, No. 24-cv-2653 (ECT/JFD), 2024 U.S. Dist. LEXIS 211802, at *6 (D. Minn. Nov. 21, 2024) (collecting cases).

As for their several state law claims, the Plaintiffs do not point to any "clear declaration" from Maine "submit[ing] itself [or FAME] to the jurisdiction of a federal court" on any of the claims they bring against FAME. *Ramsey*, 366 F.3d at 15. Indeed, Maine explicitly refuses to waive Eleventh Amendment protections "except where such waiver is explicitly stated by law." 14 M.R.S. § 8118. None of the state statutes in the Plaintiffs' complaint—the Maine Debt Collection Practices Act (Count II), the Maine Unfair Trade Practices Act (Count III), or the Maine Student Loan Bill of Rights (Count III)—contains this explicit waiver. Instead, the Plaintiffs claim that Maine waived FAME's Eleventh Amendment immunity implicitly because FAME could be construed as a "debt collector," "creditor," or "student loan servicer" within

26

the ambit of the various provisions of these state laws.  Setting aside whether FAME is a "debt collector," "creditor," or "student loan servicer" as defined under each of these statutes, which FAME vigorously disputes, the Plaintiffs argument is unavailing because the law requires Maine to clearly declare its submission to federal court jurisdiction.  *Id.* (reserving Eleventh Amendment protections "except where such waiver is explicitly stated by law"); *see also Ramsey*, 366 F.3d at 15.

Finally, although the Plaintiffs are correct that Maine waives FAME's immunity from suit in limited circumstances, including from suit "on its written contracts," 20-A M.R.S. § 11417(K),[8] this is a general waiver of immunity from suit in state court and not a waiver of FAME's distinct Eleventh Amendment immunity from suit in federal court.  As a matter of law, a state's general waiver of sovereign immunity, without expressly subjecting itself to suit in federal court, does not waive Eleventh Amendment immunity.  *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 676 (1999) ("[A] State does not consent to suit in federal court merely by consenting to suit in the courts of its own creation"); *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241 (1985) ("Although a State's general waiver of sovereign immunity may subject it to suit in state court, it is not enough to waive the immunity guaranteed by the Eleventh Amendment") (citing *Florida Dept. of Health v. Florida Nursing Home Assn.*, 450 U.S. 147, 150 (1981) (per curiam); *see also Abdisamad*, 2019 U.S. Dist. LEXIS 103130 at *5-6 (noting that

---

[8]    In addition to its written contracts, Maine permits private actions against FAME under three select provisions of state law: (1) the Maine Freedom of Access Act, (2) the Maine Administrative Procedure Act, and (3) the Maine Tort Claims Act.  The Plaintiffs do not bring a claim under these statutes.

Maine's waiver of sovereign immunity under the Maine Civil Rights Act and Maine Tort Claims Act does not waive Eleventh Amendment immunity from suit in federal court).  Thus, to the extent Maine law permits the Plaintiffs to bring a common law breach of contract claim against FAME, *see Am. Compl.* ¶¶ 63-64 (Count IV), the Plaintiffs must do so in state court.  *See Coll. Sav. Bank*, 527 U.S. at 676.

### 2.    *Ex parte Young*

In *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court recognized an exception to a state's Eleventh Amendment immunity, holding that a federal court has jurisdiction in a suit against a state officer to enjoin official actions violating federal law, even though the state itself may be immune.  *See also Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) ("To ensure the enforcement of federal law, however, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law"); *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146, (1993) (*Ex parte Young* "ensures that state officials do not employ the Eleventh Amendment as a means of avoiding compliance with federal law").

The *Ex parte Young* exception to Eleventh Amendment immunity is limited to prospective relief against state officials and does not apply to state agencies.  *Cotto v. Campbell*, 126 F.4th 761, 764 (1st Cir. 2025) ("[T]he *Ex parte Young* exception applies only when individuals seek prospective relief against a state official's ongoing violation of federal law"); *Irizarry-Mora v. Univ. of P.R.*, 647 F.3d 9, 11 n.1 (1st Cir. 2011).  So although the Eleventh Amendment does not bar the Plaintiffs from

28

obtaining prospective injunctive relief against a state official under *Ex parte Young*, it does not permit the Plaintiffs to "obtain such relief against a state or its agency," including FAME. *Poirier*, 558 F.3d at 97 n.6. Thus, because the complaint's claims against FAME do not seek prospective injunctive relief against a state official, the *Ex parte Young* exception is inapplicable, and the Eleventh Amendment's protection from federal suit bars the Plaintiffs' claims against FAME.

## B.   The Attorney Defendants

Turning to the Attorney Defendants' motion to dismiss, the Court concludes that the Plaintiffs have failed to state a plausible claim for relief against the Attorney Defendants. As to Count II, the Plaintiffs have not plausibly alleged that the Attorney Defendants engaged in conduct prohibited by federal or state fair debt collection practices law. As to Count III, the Plaintiffs have not plausibly alleged that either the Maine Student Loan Bill of Rights or the Maine Unfair Trade Practices Act applies to the Attorney Defendants themselves or their conduct. Accordingly, the Court grants the Attorney Defendants' motion to dismiss.

### 1.   Count II – Maine and Federal Fair Debt Collection Practices Act Claims

In support of their motion to dismiss Count II, the Attorney Defendants raise several arguments in the alternative. In the interest of judicial economy, the Court addresses only the arguments necessary to resolve their motion and does not discuss the rest. However, given the general rule that "[w]hen a court is confronted with motions to dismiss under both Rules 12(b)(1) and 12(b)(6), it ordinarily ought to decide the former before broaching the latter," the Court briefly explains why the

Attorney Defendants' jurisdictional arguments under the *Rooker-Feldman* do not apply to this case. *Deniz v. Municipality of Guaynabo*, 285 F.3d 142, 149 (1st Cir. 2002).

"Under what has become known as the *Rooker-Feldman* doctrine, federal district courts lack jurisdiction over 'cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'" *T.M. v. Univ. Md. Medical Sys. Corp.*, 608 U.S. ___, 146 S. Ct. 1739, 2026 U.S. LEXIS 2557, at *8 (June 18, 2026) (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U. S. 280, 284 (2005)); *accord Federacion de Maestros de P.R. v. Junta de Relaciones del Trabajo de P.R.*, 410 F.3d 17, 23-24 (1st Cir. 2005). Here, the Plaintiffs filed their complaint on November 25, 2024, while state court proceedings were ongoing. The state trial court entered final judgment on May 2, 2025, between the time the defendants filed their reply briefs in support of their motions to dismiss. *See, e.g.*, *Att'y Defs.' Reply*, Attach. 1, *Decision and J.* Moreover, the Plaintiffs' claims concern alleged injuries caused by the Attorney Defendants' conduct, not from any judgment issued by the state court. So although abstention doctrines or principles of comity may apply during "parallel state and federal litigation, *Rooker-Feldman* is not triggered simply by the entry of judgment in state court," because "'the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction.'" *Exxon Mobil Corp.*, 544 U.S. at 292 (quoting *McClellan v. Carland*, 217 U.S. 268, 282 (1910)).

Instead, "[d]isposition of the federal action, once the state-court adjudication is complete, would be governed by preclusion law." *Id.* at 293.

Although the Attorney Defendants include an argument in the alternative regarding the preclusive effect of the state court and administrative proceedings, because the Court concludes the complaint fails to state a plausible claim for relief against the Attorney Defendants, the Court does not reach their arguments on preclusion. *See Gonzalez v. Wells Fargo Bank, N.A.*, No. 2:12-cv-00286-DN, 2013 U.S. Dist. LEXIS 80245, at *1-2 (D. Utah June 4, 2013) (granting motion to dismiss for failure to state a claim for relief and declining to reach the alternative argument under preclusion law).[9]

Turning to the Plaintiffs' claims under Count II, to plausibly plead a claim under either the Fair Debt Collection Practices Act (FDCPA) or Maine Fair Debt Collection Practices Act (MFDCPA), a plaintiff must plausibly allege that "(1) he was the object of collection activity arising from consumer debt, (2) the defendant is a debt collector within the meaning of the statute, and (3) the defendant engaged in a prohibited act or omission under the FDCPA" or MFDCPA. *Poulin v. Thomas Agency*,

---

[9]      The Court's approach should not be construed as passing judgment on the preclusive effect of the state court proceedings on the issues and claims raised in the Plaintiffs complaint.  The Court simply declines to undertake the onerous task of reviewing the various state records to determine which claims and issues may or may not be precluded when the complaint otherwise fails to state a plausible claim for relief.

        Similarly, the Court does not address the Attorney Defendants' argument that the Plaintiffs' lack standing on Count II. *Att'y Defs.' Mot.* at 10-14.  The FDCPA actions dismissed for lack of standing that the Attorney Defendants cite in their motion are factually distinct from the allegations in the Plaintiffs' complaint.  Furthermore, the pecuniary loss the Plaintiffs allege they would suffer from having to pay what they claim they do not owe on their student loan would appear to satisfy the injury-in-fact requirement for standing to pursue a claim for the declaimed false or misleading representations alleged in their complaint.  Again, the Court need not wade into this complicated area of law when the complaint fails on its face to withstand basic Rule 12(b)(6) scrutiny.

31

760 F. Supp. 2d 151, 158 (D. Me. 2011) (quotation marks omitted); *see also* 32 M.R.S. §§ 11002, 11013.  Here, only the third element is at issue.  Specifically, the Plaintiffs allege the Attorney Defendants violated the FDCPA and MFDCPA by making "false, misleading, and deceptive representations of the character, amount, or legal status of the Plaintiffs' student loan," and using "false or misleading documentation in lawsuits and agency administrative decisions." *Am. Compl.* ¶¶ 62-65.

The Court concludes that the Plaintiffs fail to plausibly allege that the Attorney Defendants engaged in conduct prohibited by either statute.  First, many of the claims in their complaint are barred by the applicable statute of limitations.  As for the few claims that remain, the Plaintiffs have failed to plausibly allege that the Attorney Defendants engaged in conduct prohibited by the FDCPA or MFDCPA, either because the alleged unlawful conduct is not attributable to the Attorney Defendants or because the complaint is devoid of factual support for the Plaintiffs' conclusory allegations of illegal conduct.

First, as for the allegations against the Attorney Defendants regarding tax offsets, those claims fail to state a claim because they allege a legal impossibility.  The Attorney Defendants—a private attorney and his law firm—do not have the authority to collect tax offsets because only "[a]n agency of the State" may collect tax offsets under Maine law.  *See* 36 M.R.S. § 185-A(1).  Similarly, any allegations regarding charges for fees, costs, and interest on the Plaintiffs' defaulted student loan are not attributable to the Attorney Defendants, but to FAME, which is immune under the Eleventh Amendment.  *See supra* IV.A.

32

Second, both the FDCPA and MFDCPA impose a one-year statute of limitations period. *See Wilmington Tr., Nat'l Ass'n as Tr. for MFRA Tr. 2015-1 v. Howe*, No. 2:21-cv-00278-NT, 2024 U.S. Dist. LEXIS 228373, at *27 (D. Me. Dec. 18, 2024) ("Any suit for an FDCPA violation must be brought within one year of the date that the violation occurred") (citing 15 U.S.C. § 1692k(d)); 32 M.R.S.A. § 11054(4) ("An action to enforce liability under this section shall be brought within one year from the date on which the violation occurs"); *see also Kueter v. Chrysler Fin. Corp.*, No. 98-cv-234-B, 2000 U.S. Dist. LEXIS 8061, at *8 (D. Me. Apr. 5, 2000) (stating the same). Accordingly, the Plaintiffs' claims in Count II are limited to the alleged violations occurring one year before November 25, 2024, the date the Plaintiffs filed their initial federal complaint.

Based on the dates of the Attorney Defendants' actions, the applicable statutes of limitation bar many of Count II's claims. *See Pls.' Opp'n to Att'y Defs.' Mot.* at 1-2. This includes complaint's claims that the contents of the Attorney Defendants' December 2022 collection letter to Benjamin Webber and the state court complaint against the Plaintiffs filed in July 2023 somehow violate the FDCPA or the MFDCPA. *Am. Compl.* ¶¶ 29-33.

Thus, what remains is the Plaintiffs' claim that the Attorney Defendants' conduct in state court proceedings after November 25, 2023 violated either the FDCPA or the MFDCPA. However, the only evidence the Plaintiffs point to is an affidavit filed in the state collection action from Jennifer Lanphear, a FAME employee, which the Plaintiffs claim, among other defects, "does not include all

33

payments received, or the correct rate of interest," that Ms. Lanphear lacks personal knowledge of the Plaintiffs' account or that FAME's records referenced by the affidavit are not kept in the regular course of FAME's business and are otherwise inaccurate, unreliable, or untrustworthy. *Am. Compl.* ¶¶ 20-22, 38-39.

For several reasons, the Plaintiffs fail to state a plausible claim. First, these allegations are conclusory, and the Plaintiffs posit no evidence to support these claims, in particular, the purported uncredited payments or that the proper interest rate was not applied. *See Schatz*, 669 F.3d at 55 (A court may "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements").

Second, beyond their conclusory allegations about the propriety of the Lanphear affidavit, these claims—including the assertions that Ms. Lanphear lacks personal knowledge of the Plaintiffs' account or that FAME's records referenced by the affidavit are not kept in the regular course of FAME's business and are otherwise inaccurate, unreliable, or untrustworthy—are simply defenses against FAME's collection action in state court and without more do not invite a plausible inference that the Attorney Defendants violated the FDCPA or MFDCPA. *Id.* ¶¶ 20-22, 38. Although it is clear the Plaintiffs dispute the balance of their student loan, there is a chasm between having divergent legal interpretations of a loan agreement's terms about what that borrower owes and a lawyer making false, deceptive, or misleading representations in court.

Third, as pleaded in the complaint, none of this alleged conduct appears attributable to the Attorney Defendants. The Plaintiffs neither allege nor plead any facts to suggest that the Attorney Defendants were even aware of Ms. Lanphear's alleged lack of personal knowledge or the alleged deficiencies in FAME's business records. Moreover, the Attorney Defendants are entitled to rely on information and records provided by their client.

At bottom, the Plaintiffs present no facts to support their conclusory allegation that the Attorney Defendants made false or misleading representations in state proceedings. Instead, they simply recite the law's prohibition that a "debt collector may not use any false, deceptive, or misleading representations or means in connection with the collection of any debt," including false representations about "the character, amount, or legal status of any debt." 15 U.S.C. §§ 1692(e), (e)(2)(A); *see also Twombly*, 550 U.S. at 555 (noting a plaintiff must plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do") (citation omitted); *Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations").

Thus, the complaint is devoid of any facts allowing "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). In other words, the Plaintiffs offer nothing beyond mere conjecture that the Attorney Defendants have engaged in unlawful debt collection practices. *See S.E.C. v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (*en banc*) ("If the factual allegations in the complaint are too meager, vague, or

35

conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal") (citing *Twombly*, 550 U.S. at 555).  The Court therefore grants the Attorney Defendants' motion to dismiss Count II for failure to state a plausible claim for relief.

### 2. Count III – Maine's Student Loan Bill of Rights and Unfair Trade Practices Act Claims

Maine's Student Loan Bill of Rights (SLBR) does not provide its own private cause of action.  Rather, the SLBR provides that any violation of the statute constitutes "an unfair trade practice under the Maine Unfair Trade Practices Act and is subject to the enforcement penalty provision contained in the Act."  9-A M.R.S. § 14-108(4).  However, the Plaintiffs have not plausibly alleged that the Attorney Defendants themselves or their conduct violated the SLBR nor have they plausibly alleged that the Attorney Defendants otherwise violated the Maine Unfair Trade Practices Act (UTPA).

First, the SLBR applies to student loan servicers operating in the state of Maine.  9-A M.R.S. § 14-102.  The SLBR defines a student loan servicer as "a person . . . responsible for the servicing of a student education loan to a student borrower."  9-A M.R.S. § 14-103(4).  The SLBR further defines "servicing" to include (1) "[r]eceiving any scheduled periodic payments from a student loan borrower" or receiving "notification of such payments and applying the payments to the student loan borrower's account," (2) "[d]uring a period when a payment is not required, maintaining account records for a student education loan and communicating with a student loan borrower regarding the loan on behalf of the loan's holder," and (3)

36

"[i]nteracti[ng] with a student loan borrower, including activities to help prevent default on obligations arising from student education loans, conducted to facilitate" receiving periodic payments or maintaining account records during a period when payment is not required. *Id.* § 14-103(1)(A)-(C).

By its own terms, the SLBR covers conduct prior to default, and not debt collection activities on a defaulted loan, and therefore does not reach the conduct of the Attorney Defendants as alleged in the complaint. The Attorney Defendants were not engaged in servicing student loans. Rather, the Attorney Defendants engaged in collection activity ten years after the Plaintiffs defaulted on their student loan. *See Am. Compl.* ¶¶ 26, 29 (The Plaintiffs defaulted on their loan in 2012 and only received the demand letter from the Attorney Defendants on behalf of FAME in 2022).

Furthermore, the Plaintiffs cannot show that the Attorney Defendants as FAME's agents are covered by the SLBR, because the statute excludes FAME from its definition of student loan servicer. The SLBR explicitly excludes "supervised financial organization[s]" from its definition of student loan servicer. 9-A M.R.S. § 14-102 ("This Article applies to a person who acts as a student loan servicer in this State, except that this Article does not apply to a supervised financial organization . . ."); *id.*, § 14-103(4) ("'Student loan servicer' does not include a supervised financial organization . . ."). Under Maine law, a supervised financial organization includes an organization "that is subject to the supervision by an official or agency of a state or of the United States and is . . . [o]rganized, chartered or holding an authorization certificate under the laws of a state or of the United States that authorizes the person

37

both to make loans and to receive deposits, including a savings, share, certificate or deposit account." 9-A M.R.S. § 1-301(38-A)(B)(1); 9-A M.R.S. § 1-301(29) ("'Person' includes . . . an organization"). FAME is a "public instrumentality of the State" of Maine, 10 M.R.S. § 964, empowered by state law to "[l]end money or otherwise extend credit to any person and exercise all powers of a lender or creditor." 10 M.R.S. § 969-A(2).

Finally, the Plaintiffs' UTPA claim fails for the same reason. Although, the UTPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," 5 M.R.S. § 207, the statute limits a private cause of action to "[a]ny person who purchases or leases goods, services or property, real or personal." 5 M.R.S. § 213(1). The Plaintiffs do not allege that they purchased or leased goods, services or property from the Attorney Defendants, and thus they cannot maintain a claim pursuant to the UTPA. *See Hoglund ex rel. Johnson v. DiamlerChrysler Corp.*, 102 F. Supp. 2d 30, 31 (D. Me. 2000) (dismissing UTPA claim because plaintiff had not purchased or leased goods, services, or property from defendant). Accordingly, the Court grants the Attorney Defendants' motion to dismiss Count III for failure to state a plausible claim for relief.

### C.    Amy Quinlan

Finally, turning to Ms. Quinlan's motion to dismiss, the Court concludes that the Plaintiffs have failed to state a plausible claim under § 1983 for First Amendment injury against Ms. Quinlan. Furthermore, the Plaintiffs' reply brief suggests that their claim is moot. Accordingly, the Court grants Ms. Quinlan's motion to dismiss.

"Section 1983 supplies a private right of action against a person who, under color of state law, deprives another of rights secured by the Constitution or by federal law." *Redondo-Borges v. U.S. Dep't of Hous. & Urban Dev.*, 421 F.3d 1, 7 (1st Cir. 2005) (quoting *Evans v. Avery*, 100 F.3d 1033, 1036 (1st Cir. 1996)).  When assessing a claim under § 1983, "[t]he first step in any such claim is to identify the specific constitutional right allegedly infringed." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989); and then citing *Baker v. McCollan*, 443 U.S. 137, 140 (1979)).  From there, the Court must determine whether the plaintiff has plausibly plead (1) "the conduct complained of was committed by a person acting under the color of state law" and (2) that conduct "deprived [the Plaintiffs'] of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 559 (1st Cir. 1989) (citation omitted).[10]

Here, the Plaintiffs claim Ms. Quinlan, acting in her official capacity as Maine's State Court Administrator, deprived them of their First Amendment right of public access to judicial records by implementing a Maine court policy that denies access to state court records for FAME collection actions. *Am. Compl.* ¶ 53-61.  There are "two related but distinct presumptions of public access to judicial proceedings and records: a common-law right of access to 'judicial documents,' and a First Amendment right of access to certain criminal proceedings and materials submitted therein."

---

[10]     Acting under color of state law requires that a "defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).

*United States v. Kravetz*, 706 F.3d 47, 52 (1st Cir. 2013) (quoting *In re Providence Journal*, 293 F.3d 1, 9-10 (1st Cir. 2002)).   Although the First Circuit has yet to resolve the extent to which the First Amendment provides a right of access to documents filed in civil cases, the First Circuit recognizes a qualified First Amendment right of public access to certain documents filed in civil litigation.   *See Courthouse News Serv. v. Quinlan*, 32 F.4th 15, 20 n.8 (1st Cir. 2022) (recognizing a qualified First Amendment right of public access to civil complaints); *Doe v. Mass. Inst. of Tech*, 46 F.4th 61, 67 (1st Cir. 2022) (acknowledging a qualified First Amendment right of public access to certain documents filed in civil litigation "whether derived from the First Amendment or from the common law").   Ms. Quinlan does not dispute that the Plaintiffs' First Amendment claim is actionable under § 1983.   *Quinlan Mot.* at 7-8.   The Court is therefore satisfied that the Plaintiffs have sufficiently identified a "specific constitutional right allegedly infringed."   *See Albright*, 510 U.S. at 271 (citations omitted).

However, the Plaintiffs have not plausibly pleaded that any conduct on the part of Ms. Quinlan deprived them of their First Amendment rights nor that any First Amendment injury ever occurred.  The Plaintiffs do not allege that they corresponded with any state court employee. Instead, the Plaintiffs' complaint recounts that they learned of the alleged state court policy after speaking to Tyler Technology, the Texas-based private company responsible for managing the Maine eCourt software program.  *Am. Compl.* ¶¶ 49-50.[11]  The Plaintiffs thus have not plausibly plead that

---

[11]     The Court does not consider the additional arguments and information provided in the Plaintiffs' opposition because they are non-responsive to Ms. Quinlan's motion to dismiss.  *See Int'l*

their alleged First Amendment injury "was committed by a person acting under the color of state law." *Gutierrez-Rodriguez*, 882 F.2d at 558 (citation omitted).

Furthermore, the Plaintiffs cite no state law or Maine Judicial Branch rule or policy to support their claim of a state court policy that denies the public access to FAME debt collection actions. Nor do they provide any details as to what that specific policy entails, including the declaimed intrusive form and burdensome fee that the Plaintiffs allege they are required to furnish to access court records, including what information that form requires and the fee's amount.

The Plaintiffs' complaint is devoid of facts to support their claim of a Maine policy denying public access to the judicial records. As pleaded, the complaint's factual allegations taken as true do not "allow[ ] the court to draw the reasonable inference that the defendant is liable for" implementing an unconstitutional policy restricting public access to FAME civil actions. *Iqbal*, 556 U.S. at 678. Here, taking "all factual allegations in [Plaintiffs'] complaint as true," they have not set forth allegations sufficient to warrant relief as a matter of law. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Count I is therefore deficient under Rule 12(b)(6), and the Court grants Ms. Quinlan's motion to dismiss.

Moreover, the Plaintiffs' own briefing suggests that Count I is moot. In their opposition to Ms. Quinlan's motion to dismiss, the Plaintiffs report that they have obtained the records for the two FAME collection actions to which their complaint

---

*Ass'n of Machinists & Aerospace Workers, AFLCIO, Local Lodge No. 1821 v. Verso Corp.*, 153 F. Supp. 3d 419, 430 (D. Me. 2015) (recognizing the "court is restricted to the allegations in the . . . complaint" and that facts provided in response to a motion may be considered "only to the extent they shed light on the facts and theories actually alleged in the [complaint]").

41

claims state court policy denied them access. *See Pls.' Opp'n to Quinlan's Mot.* at 2-3 (describing themselves as "prevailing parties"). Because the Plaintiffs only seek prospective relief on Count I and because they obtained the courts records that they claim they were denied access to, the Plaintiffs have thus obtained the very relief sought and their claims under Count I are therefore moot. *See LaMarche v. Mayorkas*, No. 23-30029-MGM, 2024 U.S. Dist. LEXIS 92963, at *11 (D. Mass. May 22, 2024) ("The Court can no longer grant these Plaintiffs effectual relief because they have obtained the very relief they sought").[12]

## V.   CONCLUSION

Accordingly, the Court GRANTS the Motion to Dismiss of Defendant Amy Quinlan (ECF No. 5), Defendants Edwin R. Daggett, Jr., and Daggett & Parker's Motion to Dismiss Plaintiffs' Complaint (ECF No. 8), and Defendant Finance Authority of Maine's Motion to Dismiss (ECF No. 9).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 14th day of July, 2026

---

[12] The Plaintiffs' request for attorney's fees in their opposition is procedurally improper, and the Court does not address their request. *Pl's Opp'n to Quinlan's Mot.* at 3. Rule 54(d)(2) requires that attorney's fees be sought by motion, post-judgment, citing both the grounds for entry of the award and the amount of compensation sought. *See* FED. R. CIV. P. 54(d)(2); *Havinga v. Crowley Towing & Transp. Co.*, 24 F.3d 1480, 1490 n.20 (1st Cir. 1994).

42